People of State of Illinois ex rel. John Gutknecht,
State's Attorney for County of Cook, State of
Illinois, and Charles B. O'Malley, District Engi-
neer of Building and Zoning Bureau, Appellees, v.
John Emerson, Appellant.

Gen. No. 47,028.

First District, Third Division.
June 21, 1957.
Released for publication September 30, 1957.

Edward W. Barrett, and Robert A. Sprecher, both of
Chicago, for appellant.

John Gutknecht, State's Attorney of Cook county, of Chicago (Gordon Nash, Martin R. Handelman, Robert G. Mackey, Charles Dana Snewind, Francis X. Riley, William Sylvester White, Assistant State's Attorneys, all of Chicago, of counsel) for plaintiffs-appellees.

JUDGE FRIEND delivered the opinion of the court.

Plaintiffs brought suit to enjoin the defendant, John Emerson, from commercially using, or allowing a two-story converted barn (popularly known as the Play Barn) on his property to be commercially used, as a dance hall or a general recreational hall for the private entertainment of various groups of people renting the facilities. The complaint alleged such use to be a public nuisance, as well as a violation of the provisions of the Zoning Ordinance of Cook county (secs. 7 and 16), approved and adopted August 20, 1940. By agreement of the parties, the issue of a public nuisance was eliminated from the case. The cause was heard by a master in chancery, who recommended that an injunction issue restraining such use by defendant of the Play Barn, and the chancellor entered a decree confirming the findings and recommendations of the master, from which defendant appeals. The Play Barn was designed and constructed in 1931–1932 for the dual purposes of stabling horses on the ground level and providing a recreational area on the second floor. Defendant, who has owned and controlled the barn only since 1951, contends that it was so used from 1932 until the adoption of the ordinance in 1940 and that he was therefore entitled to the nonconforming provision of the zoning ordinance (sec. 16) and statute (Ill. Rev. Stat. 1955, ch. 34, sec. 152i); and he asserts that the nonconforming use was never discontinued or abandoned by the owner from the date of its construction to the present time.

The property in question is located in an unincorporated area near Glenview, Illinois. Defendant's

mother was the owner, by inheritance, of a 120-acre farm which, by 1928, was reduced to eighteen acres. She parceled these eighteen acres among her children, and on November 10, 1951 deeded four and one-half acres to the defendant; his brothers and sisters received title to contiguous property which was part of the remaining eighteen acres. The four and one-half acre parcel now owned by defendant is the subject matter of this litigation; it is improved with a house, stables and two barns (the smaller one, twenty-four by forty-four feet, being the Play Barn), all these improvements having been constructed by defendant's mother in the period 1931–1932. The ground area of the Play Barn was designed as a stable and as storage quarters for hay and farm equipment generally; it also contains a garage. The second-story level was finished with a pine floor, with access to the ground level by a finished inside staircase. The single piece of furniture on the second floor was a piano which defendant's mother had put there in 1932. On occasion private organizations rented the Play Barn for parties and assumed entire responsibility for entertainment and refreshments. Whether this use was customary and habitual and so continued, uninterrupted from 1932 to 1940 and thereafter, as defendant contends, is the salient controverted question of fact presented for determination.

The evidence is conflicting, and since the case turns largely on an evaluation of the testimony adduced upon the hearing before the master, it will be set out in some detail. Defendant's witness Elmer Palmgren, a nurseryman of Glenview and president of that village, stated that he had attended dances at the Play Barn prior to his marriage eighteen years ago. He testified that to the best of his recollection he attended dances there four or five times a year from 1932 through 1940, and that the dances were given by local organizations from Glenview, Evanston and adjacent areas. He said that

since 1940 he had been there perhaps fifty times, and that the Lions Club, to which he belonged, had held a dance there during this latter period. However, on cross-examination, the only other organization he could remember sponsoring parties at the barn prior to or during 1940 was the Congregational Church.

Defendant, testifying in his own behalf, gave his age as thirty-two. He stated that the Play Barn was completed in 1932, that it had a finished pine floor on the second story or hayloft, that there was always a piano on the second floor, and that this space was used in 1932 and 1933 for private parties. He said that he attended only one of these, when he was ten years old—a party given in the early fall of 1932 after the barn was completed, by Ernst Kaplan of Des Plaines, one of the men who built the barn. The only other party at which he was personally present before 1940 was one given by the German Lutheran Church of Evanston in 1935. It further appears from defendant's testimony that the barn was leased to the Longmeadow Hounds in 1933 and 1934, an organization which used it for stabling horses; that there were four stalls in one portion of the ground floor and a garage in the other. The lease on this tenancy was received in evidence; it reserved to the lessor (at that time defendant's mother) "the large room over the stables," and carried the provision that said space would "not be rented or used for commercial entertainment purposes."

A Mrs. Taylor rented the barn from 1934 to 1939; she conducted a riding academy there and used the first floor for stabling horses. Defendant testified that during this period she rented the upstairs for dancing to private parties, individuals, groups or organizations that approached her, but he was not present at any of these parties, and predicates his statement merely on what he says was common knowledge that the parties were held. Major Roy B. Nordheimer rented the four

and one-half acre area from 1939 until 1942 and used the barns for quartering horses.

George F. Nixon, a county commissioner, called as a witness for defendant, testified that he was on the premises for the first time in 1939, the year in which Major Nordheimer's lease commenced. Mr. Nixon did not recall being upstairs in the barn at that time, but later he attended a party there with friends who were members of the Glenview Club, and about two years ago he gave a party for his son and Vernon Lausch, Jr. He had no recollection of attending parties in the barn prior to 1940. He further testified that Britton Budd, Bernard J. Fallon and he boarded horses there in 1939 and 1940, and even prior to that time.

In rebuttal, plaintiffs called, among others, George Emerson and Major Nordheimer. George Emerson is plaintiff's father, who has been familiar with the property in question since 1913. His testimony, however, is self-contradictory—that there were no parties in the barn between 1932 and 1951, that there were parties there in 1942 and 1950. Major Nordheimer, a former Canadian Army officer, was at the time of the trial employed by the University of Chicago as a manager of the faculty exchange. He testified that in August 1938, after lengthy negotiations which were handled by Commissioner Nixon (of George Nixon and Company), he signed a lease with Mr. and Mrs. George Emerson for the four and one-half acre plot, which included the Play Barn; the lease was destroyed in 1942. After taking possession under the lease he put in eight box stalls on the first floor of the barn, where he customarily kept eight horses and seldom fewer than four. According to his best recollection he vacated the premises either in the fall of 1941 or the spring of 1942. He remembered, rather ruefully, the piano on the second floor of the Play Barn; he described the piano as "an antique and out of tune." Before giving a house-

374

warming party in the Play Barn (the only party he gave there) he arranged to have the piano tuned, but it was past tuning. He never subleased the second floor of the Play Barn, nor did he ever receive rentals from any groups or organizations for its use. He maintained his home on the Emerson property and was away only occasionally for short periods when he attended horse shows. The Play Barn was within 100 feet of his house, but he never saw any member of the Emerson family use it for social purposes; neither did he recall John Emerson's obtaining permission to have a party there.

The foregoing was the salient testimony concerning the use of the property. Defendant contends that the evidence adduced by him shows that the barn was used for parties and dances until passage of the ordinance, and that therefore a continued use of the premises after adoption of the ordinance constitutes a legal nonconforming use. Under the current weight of authority it was incumbent upon defendant to prove the affirmative defense interposed. Abhau v. Grassie, 262 Ill. 636; Bell v. School Dist. No. 804, 407 Ill. 406.

In analyzing the evidence the master concluded and the chancellor found that the use of the premises at the time of the adoption of the ordinance was for a riding stable, and that no existing use for dances and parties, within the meaning of the ordinance, was established by the evidence; that even if it could be said that a nonconforming use had been established prior to the passage of the ordinance, it is clear that such use was discontinued or abandoned, since no habitual use of the barn for dances or parties is claimed until 1946. Thus there were ten or eleven years, from 1935 to 1946, when only three or four dances or parties are credibly shown to have been held in the barn—one in 1935, the defendant's birthday party in 1941, and the homecoming party for one of the elder Emerson's sons-in-law in 1945. Evidently the master was not persuaded by the

testimony of Palmgren because, notwithstanding his testimony that he attended dances there four or five times a year from 1932 to 1940, he could specifically recall only one dance that he had attended. Defendant himself was present at only two parties between 1932 to 1940. He testified that there were other parties but does not describe them; rather, he shows by his own testimony that from 1933 to 1942 the premises were rented to tenants who stabled horses; the second floor was excluded in the Longmeadow Hounds lease—it was reserved to the lessor and carried the provision that the second floor "not be rented or used for commercial entertainment purposes." Although defendant asserts that subsequent tenants subleased the loft for dances, he was unable to give any details, and he did not know how Major Nordheimer used the premises. Nordheimer said that no dances or parties were held during his tenancy. From this evidence the master concluded that the record warranted the finding that at the time of passage of the ordinance in 1940 the property was under lease to Major Nordheimer for use as a riding stable, and that no use was made thereof for dances or parties at that time. The conclusion to be drawn from this evidence is that there was no such customary or habitual use of the barn as to justify its present use as a nonconforming use under the ordinance; that at best there were only a few scattered dances and parties held in the barn from the time it was built in 1932 to 1935 or 1936, and none thereafter until passage of the ordinance. Such occasional use does not constitute a use sufficient to establish a nonconforming use. Durning v. Summerfield 235 S.W.2d 761; 1 Yokley, Zoning Law and Practice, 2nd ed., par. 148, p. 365.

■ Defendant imposes great weight on the piano in an attempt to prove the continuing use of the Play Barn as a commercial entertainment venture; but bal-

376

anced against it are the terms of the lease to the Long-meadow Hounds prohibiting its use for commercial entertainment purposes, as well as the testimony of witnesses who stated that only an occasional party had been given in the Play Barn up to 1946. A great deal of evidence was adduced on the hearing, the record embracing more than 500 pages; there is conflict as to the salient issues of fact, but the master who saw and heard the witnesses resolved the issues against defendant.

" . . . although his [the master's] conclusions do not carry the weight of the verdict of a jury, nor the findings of a chancellor who has heard the evidence, they are, nevertheless, entitled to weight in determining the credit to be given the testimony. The findings when approved by the chancellor, as was done in this case, will not be disturbed unless manifestly against the weight of the evidence." Bydalek v. Bydalek, 396 Ill. 65. See also Freymark v. Handke, 415 Ill. 360. The chancellor who heard exceptions to the master's report approved the master's findings, and after a careful examination of the record we have reached the conclusion that he was justified in so doing.

Accordingly, the decree of the Superior Court of Cook county enjoining defendant from leasing his premises to private parties should be affirmed, and it is so ordered.

Decree affirmed.

BURKE, P. J., concurs.

BRYANT, J., took no part.